# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-1543(JCH) |
| and | : | |
| | : | |
| TAIKA BILBO, ET AL | : | MAY 8, 2013 |
| Interveners, | : | |
| | : | |
| v. | : | |
| | : | |
| CLIFTON HYLTON, ET AL, | : | |
| Defendants. | : | |

## AMENDED BENCH RULING[1]

The United States of America ("the government") brings this action on behalf

of Jermaine Bilbo ("Mr. Bilbo"), Taika Bilbo ("Mrs. Bilbo"), and DeMechia Wilson ("Ms.

Wilson") (collectively "the intervenors"), to enforce the Fair Housing Act, 42 U.S.C.

§ 3601, et seq.  The action is brought against Merline Hylton ("Ms. Hylton"), Clifton

Hylton ("Mr. Hylton"), and Hylton Real Estate Management ("HREM") as the owner and

managers of a property located at 5 Townline Road, Windsor Locks, CT.

The Complaint (Doc. No. 1) alleges that the defendants violated the Fair Housing

Act in three ways: (1) by refusing to negotiate for the rental of 5 Townline Road to Ms.

Wilson and her two minor children because of their race, in violation of section 3604(a)

of title 42 of the United States Code; (2) by discriminating against Mr. and Mrs. Bilbo

and Ms. Wilson and her minor children in the terms, conditions, or privileges of renting a

dwelling because of race, in violation of section 3604(b); and (3) by making

---

[1] The Ruling is amended to correct a misreference to "East Hartford," which should have been to the "northeast neighborhood of Hartford," or the "North End of Hartford."

discriminatory statements based on race regarding the rental of 5 Townline Road, in violation of section 3604(c).

## I.    FINDINGS OF FACT

Mr. and Mrs. Hylton are married and both are black and of West-Indian descent. They both own multiple properties in Connecticut.  Mr. Hylton is the sole owner, officer, and director of Hylton Real Estate Management, Inc. (HREM).  HREM is a property manager and was created approximately five to seven years ago.  A property manager's role is to interview, select, and correspond with tenants, collect rent, and repair properties.  Mrs. Hylton has no involvement in HREM.  Mr. Hylton opened a checking account in the name of HREM, and he sometimes pays his mortgages using that checking account, although sometimes he uses a personal account.  Mr. Hylton started HREM in part to organize his real estate holdings and also, in part, to protect himself from liability.  From June 2009 to June 2010, Mr. Hylton was engaged in the business of renting dwellings.

Mrs. Hylton owns 5 Townline Road.  She had no involvement in renting the house or in interacting with the renters (both the Bilbos and the Joneses, the current tenants).  She had Mr. Hylton handle all aspects of the rental.  He identified himself as the person of contact for potential renters, he showed the house, he collected the application, he provided and picked up the lease, and he collected rent.  However, Mr. Hylton discussed with her all of the actions he was taking.  Mr. Hylton did not act alone in renting the property.

The properties owned by the Hyltons are: (1) 6 Meg Way, Windsor Locks, CT (owned jointly by Mr. and Mrs. Hylton); (2) 73-75 Pine Street, Manchester, CT (owned

by an LLC, with Mr. Hylton as the sole member); (3) 92-94 Baltimore Street, Hartford, CT (owned by an LLC, with Mr. Hylton as the sole member); (4) 9 – 11 Benton Street, Hartford, CT (owned by an LLC, with Mr. Hylton and HREM as the sole members); (5) 27 Norfolk Street, Hartford, CT (owned by an LLC, with Mr. Hylton as the sole member); (6) 9 – 11 Lilley Street, Manchester, CT (owned by an LLC, with Mr. Hylton as the sole member); (7) 381 Sigourney Street, Hartford, CT (owned by Mrs. Hylton); (8) 5 Towline Road, Windsor Locks, CT (owned by Mrs. Hylton).  Most of Mr. and Mrs. Hylton's tenants are Puerto Rican or black and a high majority of tenants (between 80 and 99%) receive Section 8 housing.

Mr. and Mrs. Hylton were living at 5 Townline Road until they purchased a house at 6 Meg Way in Windsor Locks, CT, on September 10, 2008.  They tried to sell 5 Townline Road, but were unable to do so.  After trying to sell 5 Townline Road to no avail, the Hyltons offered the house for rent by posting an ad on craigslist.com.  The ad directed interested applicants to contact Mr. Hylton about the property.

Mrs. Bilbo responded to the ad by calling Mr. Hylton.  Mr. and Mrs. Bilbo are married with three children.  Mr. Bilbo is African-American.  Mrs. Bilbo is white.  On April 14, 2010, Mr. Hylton met with the Bilbos to show them the house at 5 Townline Road. Mr. Hylton gave the Bilbos a tour of the property, answered their questions, and provided the Bilbos with a rental application.  The Bilbos completed the rental application at the property and provided it to Mr. Hylton.  They did not provide, nor did Mr. Hylton request, supporting documentation to confirm the information provided on the rental application.  The rental application signed by the Bilbos carried the name "Hylton Real Estate Management, Inc."  At no point while viewing, applying for, or renting 5

Townline Road did Mr. or Mrs. Bilbo speak with Mrs. Hylton.  However, Mr. Hylton consulted with Mrs. Hylton as to renting the house to the Bilbos.

The Bilbos moved into the house at 5 Townline Road shortly before May 1, 2010. Mr. Hylton left a lease in the house for them to complete, which he later picked up.  The lease bore the name "Hylton Real Estate Management, Inc." at the top.  Mr. and Mrs. Hylton both signed the lease (as did the Bilbos).  The Bilbos paid a security deposit of $1,750.

Before Mr. and Mrs. Bilbo rented 5 Townline Road, they had considered purchasing a house.  Around the second week of May 2010, their mortgage broker advised them that they could obtain a loan from the Department of Veterans Affairs because Mr. Bilbo is a veteran.  Mr. and Mrs. Bilbo began looking in the area and found a house they wanted to purchase on May 28, 2010.  Their offer on the house was approved on May 29, 2010.  On May 29, 2010, Mr. Bilbo called Mr. Hylton to inform him that he and his wife needed to break their lease.  Mr. Hylton was upset and informed Mr. Bilbo that he wanted him to buy out the lease, which extended until May 2011.  Mr. Bilbo sent Mr. Hylton a letter, on or around June 1, 2010, informing him in writing that he expected to close on a house on June 30, 2010, and would no longer be able to rent 5 Townline Road.

Mr. and Mrs. Bilbo decided they would find someone to sublet the home for Mr. Hylton.  On June 18, 2010, the Bilbos posted an advertisement on craigslist.com listing 5 Townline Road for rent for $1,750 per month.  The advertisement listed the house available as of July 1, 2010.  Mr. and Mrs. Bilbo started showing the property.  It was at this time that they reviewed their lease and realized that the lease required the Bilbos to

obtain prior written consent to sublet the property.  The Bilbos decided to continue

showing the house and hope that the Hyltons would agree that it was more profitable to

have someone else move in.

Ms. Wilson contacted Mrs. Bilbo on June 21, 2010, about the property.  Ms.

Wilson is African-American and has two children.  She was living in the North End of

Hartford, Connecticut at the time, with her children and mother.  Ms. Wilson was

interested in the house because it was only 10 minutes away from her job and the

school system was comparable to the schools her children attended—schools which are

outside of Hartford because Ms. Wilson would not send her children to the less

advantageous Hartford schools.  Ms. Wilson sent her children to Bolton Elementary and

Middle School as part of the regional school choice program.

Ms. Wilson went to view 5 Townline Road on June 22, 2010.  Mr. Bilbo showed

her the house and provided her with an application.  Mr. Bilbo thought Ms. Wilson would

make an excellent tenant and contacted Mr. Hylton to inform him that he found a viable

subtenant.  Mr. Hylton said he was unhappy that the Bilbos were breaking the lease and

that he had bad experiences with subtenants before.  Mr. Bilbo told Mr. Hylton that he

felt very comfortable with Ms. Wilson and that she could afford the rent, had references

saying she never paid her rent late, and was looking for a long-term rental.

Mr. Hylton agreed to sublet the property to Ms. Wilson, but said he would

continue to receive rent from the Bilbos (who would receive rent from Ms. Wilson).  Mr.

Bilbo asked Mr. Hylton to provide written permission as required by the lease.  Mr.

Hylton then asked Mr. Bilbo whether Ms. Wilson is black or white.   When Mr. Bilbo told

Mr. Hylton that Ms. Wilson is black, Mr. Hylton said he did not want too many black

people at the property.  Mr. Hylton told Mr. Bilbo that he only rented to him and his wife because Mrs. Bilbo is white, and "it was a good mix."  Mr. Hylton also said that the neighbors would not want too many black people in the neighborhood.  He told Mr. Bilbo to try and find some good white people who could afford the property because Ms. Wilson was not going to be able to pay.

Mr. Bilbo was confused and upset by the conversation.  He did not understand how Mr. Hylton could make such statements when he himself is black.  Mr. Bilbo expects to face racism, but not from older black men who he presumes faced even worse incidents of discrimination than he.  He was hurt and shocked by the conversation and upset that he had to play a role in rejecting Ms. Wilson because of her race.  Mr. Bilbo called Ms. Wilson immediately after his conversation with Mr. Hylton and told her what happened and apologized that he would not be able to sublet to her. Ms. Wilson was confused by Mr. Hylton's reaction given Mr. Bilbo is black, and she was disappointed that she would have to start her rental search all over again.  However, at the time, she considered it was a good thing she was rejected because she did not want to rent from someone who thinks like Mr. Hylton.

Mr. Bilbo next called his wife at work and posted on Facebook about what happened.  Mrs. Bilbo was very upset about Mr. Hylton's statements and emailed Ms. Wilson to apologize for what transpired.  Mrs. Bilbo was scared because Mr. Hylton was threatening to sue them, and she was upset that she played a part in advertising a house for a man who thinks such things about people who are like her own family.  Mrs. Bilbo has experienced discrimination many times as someone in an interracial marriage, but this was the most direct example of such discrimination that she experienced.  Mrs.

Bilbo remained upset about the situation and was "on edge" for almost a year. She was frightened to go to the store for fear that she would run into Mr. Hylton.

Mr. and Mrs. Bilbo moved out of 5 Townline Road just before July 1, 2010. They never received back their $1,750 security deposit. On August 1, 2010, Mr. and Mrs. Hylton entered into a one-year lease with Francsoise and Stephen Jones to rent 5 Townline Road for $1,650. Francsoise and Stephen Jones are white. The lease that the Jones' signed include a header at the top that reads, "Hylton Real Estate Management, Inc." Mr. and Mrs. Hylton both signed each of the leases entered into by the Joneses.

A few months after the Bilbos moved out of 5 Townline Road, Mr. Bilbo ran into Mr. Hylton at the grocery store. Mr. Hylton waved Mr. Bilbo over and told him that he tried to put "hooligans" in his house.

Ms. Wilson continued looking for an apartment, but ultimately stayed living with her mother in the North End of Hartford because she did not want to move her children once the school year began. She remained living with her mother until 2012, at which point she had to accept an apartment in another area of Hartford, CT, instead of in Windsor Locks, CT. Windsor Locks is a neighborhood with more opportunities and greater upward mobility than the North End[2] of Hartford, CT. The crime rate is higher in in the North End of Hartford, particularly as to violent crime, which is 10 times greater

---

[2] The neighborhood in which Ms. Wilson lived from 2010 to 2012—when she was living at 111 Montville Street, Hartford, CT—was referred to by Ms. Wilson—and is known colloquially—as the North End of Hartford. However, when Professor Lance Freeman testified to the advantages and disadvantages facing residents of Ms. Wilson's neighborhood, he referred to the "northeast neighborhood of Hartford," which is the neighborhood in which Ms. Wilson lived as described in the census. For purposes of this Ruling, when discussing where Ms. Wilson lived as well as setting forth the statistical differences between that area and Windsor Locks, the court will refer to the neighborhood as the North End of Hartford.

per person.   The unemployment rate is substantially higher as is the number of residents on food stamps.  In the North End of Hartford, 37 percent of households are headed by a female, whereas only 14 percent of households are female-headed in Windsor Locks.  Meanwhile, the number of non-Hispanic black residents in the North End of Hartford is significantly higher than in Windsor Locks (73 percent versus 6.9 percent).  Four times as many high school students and two and a half times as many middle school students in the North End receive free or reduced lunch, which is a direct indication of how many students in the North End of Hartford are poor.  Meanwhile, the home ownership rate and median income are both two times higher in Windsor Locks. Ms. Wilson sends her children to a school in Bolton, CT, as part of the regional choice program so that her children can get a better education than that available in the North End of Hartford.  Had she moved into 5 Townline Road, Ms. Wilson would have sent her children to school in Windsor Locks.

The driving distance from 5 Townline Road to Windsor Locks South Elementary School and Windsor Locks Middle School is 2 miles and 1.4 miles, respectively.  The driving distance from Ms. Wilson's place of employment—VINFEN-CT, at 860 Prospect Hill Road in Windsor Locks, CT—to Windsor Locks South Elementary School and Windsor Locks Middle School is 7.2 miles and 6.5 miles, respectively.  The driving distance from Ms. Wilson's apartment in the North End of Hartford, CT, to Bolton Elementary School and Bolton Middle School/High School is 17 miles and 16.7 miles, respectively.  The driving distance from VINFEN-CT to Bolton Elementary School and Bolton Middle School/High School is 23 miles and 22 miles, respectively.  Ms. Wilson travels to and from her children's school four times per week during football season

(from the start of school until Thanksgiving) and two times per week during the rest of the year.  The children have off from school on federal holidays; the day after Thanksgiving; December 23 until January 2; four or five days in February for winter recess; and one additional "professional development" day.

Mrs. Bilbo researched housing discrimination and contacted the Connecticut Fair Housing Center who submitted a complaint to the Department of Housing and Urban Development (HUD).  HUD conducted an investigation during which an investigator, Jeffrey Sussman, J.D., spoke with Mr. Hylton.  During one of those conversations, Mr. Hylton told the investigator that, "if you rent to a Puerto Rican today, I guarantee there will be 10 people there tomorrow."  Pl. Ex. 1 at 5.  He also told the investigator that, if it was a white man who had broken the lease, he would just "sit back and relax and just sue them."  Id. at 12.  During the investigation, the Hyltons also responded to the complaints of Ms. Wilson and the Bilbos by claiming that they had advertised the property themselves, received a number of offers, interviewed a number of people including the Wilsons and made their choice.  See Pl. Ex. 4.

## II.    CONCLUSIONS OF LAW

The Fair Housing Act states that an aggrieved person may, after filing a Complaint with the Secretary of Housing and Urban Development, pursuant to section 3610 of title 42 of the United States Code, elect to have the claims asserted in the charge decided in a civil action.  See 42 U.S.C. § 3612(a).  On or about September 7, 2011, Mr. Bilbo, Mrs. Bilbo, Ms. Wilson and her minor children,[3] through their attorney, made a timely election to have the HUD charge resolved in a federal civil action.  The

9

Secretary subsequently authorized the United States Attorney General to file this action on behalf of the complainants, pursuant to 42 U.S.C. § 3612(o).  The Complaint sets forth three violations of the Fair Housing Act: (1) refusing to negotiate for the rental of the subject property in violation of section 3604(a); (2) discriminating in the terms, conditions, or privileges of renting a dwelling in violation of section 3604(b); and (3) making discriminatory statements based on race regarding the rental of the subject property in violation of 3604(c).  The first violation is as to Ms. Wilson only; the second and third violations are as to Ms. Wilson and Mr. and Mrs. Bilbo.

A.  42 U.S.C. § 3604(a)

The FHA makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin."  42 U.S.C. § 3604(a.  "A plaintiff can make out a claim of discrimination either 'on a theory of disparate impact or one of disparate treatment.'"  Fair Housing in Huntington Committee Inc. v. Town of Huntington, 316 F.3d 357, 366 (2d Cir. 2003).  Here, the plaintiffs are bringing a claim of disparate treatment, i.e., a claim of intentional discrimination.  Khalil v. Farash Corp., 452 F.Supp.2d 203, 207 (W.D.N.Y. 2006) (distinguishing a claim for intentional discrimination versus a claim that a facially neutral rule had a disproportionate impact on a protected group); see also Pl. Proposed Findings of Fact and Conclusions of Law (Doc. No. 86) at 17 ("Plaintiffs here rely on a theory of disparate treatment").

---

[3] The court granted the Motion to Withdraw Wilson's minor children as parties on October 28, 2012.

To bring a claim for disparate treatment, the plaintiffs may produce either (1) direct evidence of discriminatory intent or (2) indirect evidence creating an inference of discriminatory intent under the McDonnell Douglas burden-shifting framework. Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010); see also Maziarz v. Housing Authority of the Town of Vernon, 281 F.R.D. 71, 77 (D. Conn. 2012) (stating that, "[w]here a plaintiff presents direct evidence of discrimination, however, the burden-shifting analysis is inapplicable").

Direct evidence of discriminatory treatment is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse . . . action." Gallagher, 619 F.3d at 831 (citing Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). "In other words, a plaintiff brings direct evidence when he presents a 'smoking gun' of discriminatory intent." Cavalieri-Conway v. L. Butterman & Assoc., 992 F.Supp. 995, 1003 (7th Cir. 1998). Statements by a defendant that "he did not rent to Blacks, that Blacks were nothing but trouble," have been considered direct evidence of discriminatory treatment. Inland Mediation Bd. v. City of Pomona, 158 F.Supp.2d 1120, 1132, 1143 (C.D. Cal. 2001); see also Texas v. Crest Asset Management, Inc., 85 F.Supp.2d 722, 730 (S.D. Tex. 2000) (finding statements by the defendants that plaintiff was an Arab terrorist and that he should move out because he was Arab were direct evidence of discrimination).

Before the court is direct evidence that Mr. Hylton refused to allow Mr. and Mrs. Bilbo to sublet the house at 5 Townline Road to Ms. Wilson because she is black. Although skeptical at first, during a June 22nd telephone call, Mr. Hylton agreed to allow

Mr. and Mrs. Bilbo to sublet to Ms. Wilson based on Mr. Bilbo's representations that Ms. Wilson had good references, a good job, and would make a good tenant.  However, he changed his mind and refused to allow the sublet once he inquired about Ms. Wilson's race and learned that she is black.  Therefore, there is clear evidence that it was Ms. Wilson's race that led to Mr. Hylton's decision to prevent her from subletting 5 Townline Road.

Once a plaintiff produces direct evidence of discrimination, the burden of proof shifts to the defendants to show that they would have made the same decision regardless of discriminatory animus.  Crest Asset Management, 85 F.Supp.2d at 730-731.  However, the defendants cannot prevail "by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision."  Price Waterhouse v. Hopkins, 490 U.S. 228, 252 (1989).  The Hyltons have not presented any evidence that they had a legitimate reason for refusing to sublet to Ms. Wilson.  In fact, Mr. Hylton agreed to sublet to Ms. Wilson and only changed his mind once he learned of her race, showing that there could have been no other reason for the denial than Ms. Wilson's race.  Therefore, this court finds that Mr. Hylton violated section 3604(a).

A.  42 U.S.C. § 3604(b)

Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[4]  42 U.S.C. § 3604(b).  "Violations of section 3604(b)

---

[4] Again, direct evidence of discrimination obviates the need to apply the McDonnell Douglas burden-shifting framework.

are recognized where such differences include showing a member of a protected class fewer apartments, quoting higher rents, quoting later days of availability, requiring applications and credit checks, or representing apartment features differently (e.g., 'a one bedroom for the white tester; black tester told unit is really small')." Fair Housing Justice Center, Inc. v. Broadway Crescent Realty, Inc., 2011 WL 856095, at * 6 (S.D.N.Y. Mar. 9. 2011).  They also include making an apartment available to a white tenant and making a non-white tenant wait for an apartment to become available at a later date, Williamsburg Fair Housing Committee v. New York City Housing Authority, 493 F.Supp. 1225, 1248 (S.D.N.Y. 1980) ("When the staff filled a vacancy in a White-designated apartment by going down the list to find the next White family, they would be denying the apartment to the non-White families passed over.  Such a non-White family would, at least for a time, have been denied an apartment for which it was eligible. Stated differently, that family would have been discriminated against in the privileges of a rental."), and falsely stating to a black customer that no homes are for sale, see Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir. 1990) (stating that this conduct constitutes discrimination on racial grounds against the person in the provision of real estate services).

The court concludes that Mr. Hylton discriminated in the terms, conditions, or privileges of a rental, in violation of section 3604(b), in two ways.  First, as to the Bilbos, Mr. Hylton discriminated in the terms and conditions of a rental by preventing the Bilbos from subletting 5 Townline Road because of Ms. Wilson's race.  The lease agreement allowed the Bilbos to sublet if they received written permission from the Hyltons.  Mr. Hylton, although angry at first, agreed to allow the Bilbos to sublet 5 Townline Road to

Ms. Wilson.  However, when he later learned that Ms. Wilson was black, he recanted

his approval and prevented the Bilbos from subletting.  He told Mr. Bilbo to try and find

some good white people who could afford the property.  Therefore, it is clear that Mr.

Hylton would have allowed the Bilbos to sublet to Ms. Wilson had she been white.  By

preventing the Bilbos from subletting because of Ms. Wilson's race, Mr. Hylton

discriminated against the Bilbos in the terms of their rental based on race, in violation of

section 3604(b).  See HUD v. Gugliemi, 1990 WL 456958, at *9, Fair Hous.-Fair

Lending Rptr. P 25,004 (HUD ALJ 1990) (finding a violation as to the owner of a mobile

home when the mobile home park prevented the owner from selling her home to a

family with children); see also United States v. L & H Corp., Inc., 407 F.Supp. 576, 580

(S.D. Fla. 1976) (holding that a defendant's refusal to permit a white tenant to entertain

African-American guests constituted discriminatory conduct against both the white

tenant and the African-American guests).

Second, Mr. Hylton discriminated against Ms. Wilson in the privileges of a rental

by refusing to allow her to rent 5 Townline Road.  See Williamsburg Fair Housing, 493

F.Supp. at 1248 (holding that passing over a qualified Hispanic or black tenant to give

an apartment to a white tenant to meet a quota constituted discrimination in the

"privilege" of renting; see also HUD v. Kogut, 1995 WL 225277, at *12 (HUD ALJ 1995)

("Because residency is one of the many 'terms, conditions, or privileges of . . . rental,'

when Respondents terminated Complainant's residency because she rejected Mr.

Kogut's sexual advance [in violation of section 3604(a)], they also violated 41 U.S.C. §

3604(b)."); HUD v. Kelly, 1992 WL 406534, at * (HUD ALJ 1992) (finding that a

statement that complainant had "one child too many" to rent the apartment constituted a

violation of section 3604(b)).  When Mr. Hylton refused to rent to Ms. Wilson, he

prevented her from assuming residency and enjoying the privilege of renting 5 Townline

Road.   "Title VIII requires no more to establish a violation" of section 3604(b).

Williamsburg Fair Housing, 493 F.Supp. at 1248.

     B.  42 U.S.C. § 3604(c)

Section 3604(c) makes it unlawful to "make, print, or publish, or cause to be

made, printed, or published any notice, statement, or advertisement, with respect to the

sale or rental of a dwelling that indicates any preference, limitation, or discrimination

based on race, color, religion, sex, handicap, familial status, or national origin, or an

intention to make any such preference, limitation, or discrimination."  42 U.S.C. §

3604(c).  This prohibition applies to "all written or oral notices or statements made by a

person engaged in the sale or rental of a dwelling," which "include . . . expressing to . . .

any . . . persons a preference for or limitation on any purchaser or renter because of

race."  24 C.F.R. § 100.75; see also Soules v. United States Dept. of Housing and

Urban Development, 967 F.2d 817, 824 (2d Cir. 1992) (stating that "[o]penly

discriminatory oral statements merit . . . straightforward treatment" by the court in finding

FHA violations); United States v. Gilman, 341 F.Supp. 891, 896-97 (S.D.N.Y. 1972)

(finding that defendant's statement to tenant that if she had anyone who was interested

in renting an apartment, she should send them to the defendant and to make sure that

her friends were white violated section 3604(c)).

To determine whether an owner or renter's statement indicates impermissible

racial discrimination, the court asks whether the statement "suggests to an ordinary . . .

listener that a particular race is preferred or dispreferred for the housing in question."

15

Soules, 967 F.2d at 824 (citing Ragin v. New York Times Co., 923 F.2d 995, 999 (2d

Cir. 1991).  Here, Mr. Hylton's statements explicitly state that he would prefer a tenant

who is white rather than a tenant who is black.  He told Mr. Bilbo that he did not want

too many black people at the property and that Mr. Bilbo should try and find some good

white people who could afford the property.  He further told Mr. Bilbo that the only

reason he was allowed to rent the house was because his wife is white.  There is no

other way to interpret Mr. Hyltons comments than to find they "suggest . . . that a

particular race is preferred . . . [and another race is] dispreferred for the housing in

question."  Id.  Therefore, Mr. Hylton violated section 3604(c).

     Furthermore, Mr. Hylton violated section 3604(c) as to both Ms. Wilson and the

Bilbos, even though Mr. Hylton made the statements only to Mr. Bilbo.  Under the FHA,

discriminatory remarks that a defendant merely communicates to a person may

sufficiently injure that person.  See Ragin v. N.Y. Times, 923 F.2d 995, 1005 (2d Cir.

1991) (ruling that a plaintiff's mere reading of a discriminatory newspaper advertisement

could establish standing under the FHA if that advertisement caused substantial

distress).  As to Mr. Bilbo, Mr. Hylton made the statement directly to him, and he

testified at length about the harm that caused him.

     As to Mrs. Bilbo, "[i]t has long been held that whites have standing to sue under

section 3604(c) for discriminatory statements made against non-whites."  Wentworth v.

Hedson, 493 F.Supp.2d 559, 566 (E.D.N.Y. 2007); see also Roberts, 2001 WL 56376,

at *7 (finding violation as to both husband and wife regarding statements made to a

white woman about her black husband).  Although Mr. Hylton made the discriminatory

statements to Mr. Bilbo, not directly to Mrs. Bilbo, she still has standing to seek relief for

a section 3604(c) violation because "the sole requirement for standing to sue under [section] 812 [of the Fair Housing Act] is the Art[icle] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions, [s]he has suffered 'a distinct and palpable injury.'" Havens v. Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982). Here, because Mrs. Bilbo testified that she suffered significant emotional distress as a direct result of Mr. Hylton's discriminatory comments, relayed to her by her husband, she has alleged sufficient injury to confer standing as an "aggrieved person." See HUD v. Roberts, 2001 WL 56376, at *7 (HUD ALJ 2001) (finding husband had standing to seek relief under section 3604(c) when wife relayed discriminatory comments to him).

Similarly, as to Ms. Wilson, even though she heard about the statements from Mr. Bilbo, not Mr. Hylton, she was injured by the discriminatory attack against her. This is sufficient to warrant relief under section 3604(c). See HUD v. Schmid, 1999 WL 521524, at *10, Fair Hous.-Fair Lending Rptr. P 25,139 (HUD ALJ 1999) (awarding damages to a mother and her son for statements made to the mother); HUD v. Roberts, 2001 WL 56376, at *7 (finding that statements made to a plaintiff's wife regarding his race sufficiently injured the plaintiff in violation of section 3604(c)).

C.  Vicarious Liability

Although Mr. Hylton is the individual who directly discriminated against Ms. Wilson and the Bilbos, both Mrs. Hylton and HREM may be held vicariously liable for his discriminatory actions.

1.  Mrs. Hylton

"It is clear that under the FHA, owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees." Glover v. Jones, 522

F.Supp.2d 496, 506 (W.D.N.Y. 2007). Therefore, if Mr. Hylton was acting as Mrs. Hylton's agent, Mrs. Hylton, as sole owner of 5 Townline Road, is also liable for his discriminatory actions. See Cabrera v. Jakabovitz, 24 F.3d 372, 385 (2d Cir. 1994) (upholding jury finding that realty company and its brokers were agents for the landlords and that all were liable for the discriminatory practices of the brokers); see also Glover, 522 F.Supp.2d at 507 (stating that "Jones is the owner of the property . . . [and] [a]s such, she may be held personally liable").

To prove agency, three elements must be proven: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." Cleveland v. Caplaw Enterprises, 448 F.3d 518, 522 (2d Cir. 2006) (applying agency rules to FHA context).

Mrs. Hylton owns 5 Townline Road. Yet, she had no involvement in renting the house or in interacting with the renters (both the Bilbos and the Joneses, the current tenants). She had Mr. Hylton handle all aspects of the rental. Therefore, the first two elements of agency are satisfied: Mrs. Hylton gave Mr. Hylton authority to act on her behalf and Mr. Hylton accepted such authority. As to the third element, Mrs. Hylton testified that Mr. Hylton discussed with her all of the actions he was taking and that he did not act alone. In fact, Mrs. Hylton signed the lease for the Bilbos' rental as well as the Jones', indicating her approval and agreement. Therefore, the court concludes that Mrs. Hylton employed Mr. Hylton as her agent and is, therefore, liable for his

discriminatory conduct.[5]  See Cato v. Jilek, 779 F.Supp. 937, 946, n.21 (N.D. Ill. 1991)

(stating that wife, who "did not herself engage in overtly discriminatory conduct but

merely deferred to" her husband's decisions was liable because her husband acted as

her agent in renting the apartment); Hamilton v. Svatik, 779 F.2d 383, 388 (7th Cir.

1985) (finding defendant liable because, "[a]lthough there may be no evidence of

Eleanor's involvement in the incident, it is undisputed that she is the sole owner of the

building and that her brother acts as her agent")

    2.  HREM

    As to HREM, the property management company owned by Mr. Hylton, "[t]he

Fair Housing Act imposes liability without fault on employers in accordance with

traditional agency principles."  Mitchell v. Shane, 350 F.3d 39, 50 (2d Cir. 2003) (stating

that, if a real estate agent is found liable for discrimination, his employer, Century 21

Real Estate, may also be liable); HUD v. Active Agency, 1999 WL 756778, at *5, Fair

Hous.-Fair Lending Rptr. P 25,141 (HUD ALJ 1999) ("A real estate firm and its brokers

and owners may be held liable for the discriminatory acts of the firm's agents, whether

or not they directed or authorized the particular acts.").  Vicarious liability rules make

principals or employers vicariously liable for acts of their agents or employees in the

scope of their authority or employment.  Meyer v. Holley, 537 U.S. 280, 287 (2003)

(applying traditional vicarious liability principles to the Fair Housing Act context).

    The overarching issue becomes whether Mr. Hylton was serving as an agent of

HREM when he discriminated against Ms. Wilson and the Bilbos.  HREM is a property

---

[5] The fact that Mr. Hylton is Mrs. Hylton's husband does not change the analysis.  "The principal owner's liability is unaffected by the fact that the person committing the discriminatory acts in the course of disposing of the property is a relative or neighbor rather than a professional real estate agent."  Cato, 779 F.Supp. at 937, n.21 (citing Coates v. Bechtel, 811 F.2d 1045, 1051 (7th Cir. 1987).

manager.  A property manager collects rent, interviews applicants, and performs repairs.  In the rental of 5 Townline Road, Mr. Hylton performed those functions: he identified himself as the person of contact for potential renters, he showed the Bilbos the house, he collected the application, he provided and picked up the lease, and he collected rent.  Furthermore, when he performed these functions, he used documents bearing the name "Hylton Real Estate Management, Inc." at the top.  In fact, even though only Mrs. Hylton owns 5 Townline Road, Mr. Hylton also signed the Bilbos' lease.  See Pl. Ex. 18.  There would be no reason for Mr. Hylton to sign the lease unless he was signing the lease in his capacity as property manager.

        Therefore, the court concludes that Mr. Hylton managed the 5 Townline Road property as a property manager and that he did so as an agent for HREM.  See United States v. Habersham Properties, Inc., 319 F.Supp.2d 1366, 1375 (N.D. Ga. 2003) (stating that a management company was clearly the agent of the corporate owner of an apartment complex and that the management company, "as a corporation, can only act through individuals").  Because Mr. Hylton's discriminatory actions were within the scope of his role with HREM, see id. at 1376 (stating that it was within the scope of agent's employment with management company that "she was interacting with applicants and making judgments regarding applicants"), HREM is vicariously liable for Mr. Hylton's actions.[6]  See United States v. Northside Realty Assoc., Inc., 474 F.2d

---

[6] By finding HREM vicariously liable for Mr. Hylton's actions, the court has not transferred liability for damages from Mr. Hylton to HREM.  Rather, both HREM and Mr. Hylton, along with Mrs. Hylton, are liable for the violations.  See City of Chicago v. Matchmaker Real Estate Sales Center, Inc., 982 F.2d 1086, 1094, 1098 (7th Cir. 1992) (approving lower court's finding that realty corporation, owner of corporation, and individual agents were jointly liable for discrimination by agents); Jeanty v. McKey & Poague, Inc., 496 F.2d 1119, 1120 (7th Cir. 1974) (overturning lower court's dismissal of rental company and rental agent defendants, after entering judgment against owner, because "the discriminatory acts alleged were performed by" the rental company's employees).

1164, 1168 (5th Cir. 1973) (upholding lower court's finding of corporate liability in light of the fact that the individual defendant was the executive vice president of the corporation and was the "broker whose license . . . enables it to engage in the business of selling real estate").

    D.  <u>42 U.S.C. § 3603(b)(1) Exemption</u>

    The Hyltons argue that they are not subject to the provisions of section 3604(a) and (b) because they are exempt.  Under the statute, the prohibitions set forth in section 3604, other than subsection (c), do not apply to:

> any single-family house sold or rented by an owner provided that such private individual does not own more than three such single-family homes at any one time . . . if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings. . . and (B) without the publication, posting or mailing, after notice, of any advertisement or written notice in violation of section 3604(c) of this title . . ."

42 U.S.C. § 3603(b)(1).  In other words, "[t]he single-family dwelling owner can escape the rigors of Section 3604 . . .  only if he goes his discriminatory way alone."  <u>Dixon v. Muchnik</u>, (W.D.N.Y. Dec. 19, 2011) (quoting <u>Singleton v. Gendason</u>, 545 F.2d 1224, 1227 (9th Cir. 1976)).

    First, the court notes that only Mrs. Hylton may reap the benefit of the 3603(b) exemption as owner of 5 Townline Road.  See <u>HUD ex rel. Garrett et al. v. Maze et al.</u>, No. 10-M-015-FH4, 2011 WL 2201105, at *3 (HUD ALJ May 25, 2011) (holding that, because there was no evidence that a defendant possessed an ownership interest in the property, he was not entitled to the exemption).  Because neither Mr. Hylton nor HREM own the property, they cannot fall within the exemption and they remain liable for the 3604(a) and (b) violations in addition to the 3604(c) violation.

Mrs. Hylton meets the first requirement of the exemption: she owns no more than three single-family homes.  Further, she did not rent her home by using a publication, posting, or advertisement that violated section 3604(c).  Therefore, the only issue is whether she used the facilities or services of any person in the business of selling or renting dwellings.  Mrs. Hylton argues that Mr. Hylton acted as her husband when he assisted her in renting 5 Townline Road and not as someone in the business of renting dwellings.  The government and intervenors argue that Mrs. Hylton knowingly employed the services of her husband, acting through his company HREM, to rent her property.

Mrs. Hylton relies on Michigan Protection and Advocacy Service, Inc. v. Babin, 799 F.Supp. 695 (E.D. Mich. 1992).  In Babin, the court held that a defendant is not precluded from benefiting from section 3603(b) simply because she happens to be a real estate agent.  Id. at 705.  According to the Babin court, it would be inequitable to construe section 3603(b) to "render nonexempt all private transactions by persons in the real estate business."  Id.  Such an interpretation would "deprive these individuals of a statutory exemption solely because of their occupation."  Id.

However, the Babin court also stated that section 3603(b) "indicates a congressional desire to provide an exemption only for those homeowners operating in [a] purely nonprofessional manner—that is, not acting as professionals or retaining a professional on their behalf."  In Babin, the defendant—although a real estate agent— was merely trying to sell the home she owned and not acting as a real estate agent in the process.  The same cannot be said of Mr. and Mrs. Hylton.

Mr. Hylton stipulated that he is in the business of renting dwellings.  He testified that in that business, he performs tasks such as showing rental properties, meeting with

prospective tenants, selecting tenants, collecting rent, and performing repairs.  Those
are the same tasks he performed in the rental of 5 Townline Road (except for
performing repairs, which the Bilbos were obligated to do pursuant to the lease
agreement).  In the process of renting 5 Townline Road, he also used rental
applications and leases that bore the name Hylton Real Estate Management, Inc.  He
used these documents not only when renting to the Bilbos, but also when he later
rented the house to the Joneses.  In addition to using HREM documents, he personally
signed each of the leases, along with Mrs. Hylton, even though he holds no ownership
interest in the property.  To the court, this supports the court's finding that Mr. Hylton
was renting the house in his capacity as an officer of HREM, see infra, p. 19-20 (finding
HREM vicariously liable for Mr. Hylton's actions).

Mr. Hylton attempted to explain his use of the HREM documents by claiming that
he had extra leases in his truck at the time and that his use of the HREM documents
was merely a coincidence.  However, the court does not find this claim compelling for
two reasons.  First, Mr. Hylton's explanation only addresses why he used an HREM
lease when renting to the Bilbos.  He also used an HREM rental application, which he
gave to the Bilbos at least a week before he left the lease for them when they moved in.
Second, Mr. Hylton continued to use HREM documents when renting 5 Townline Road
to the Joneses in 2010 and 2011.  Therefore, the court concludes that it was no mere
"coincidence" that led Mr. Hylton to use the HREM documents in the rental of 5
Townline Road.

The court notes that there is language in Babin that one could interpret to
suggest that a defendant's use of documents bearing a corporate logo is not a factor in

the exemption analysis.  In <u>Babin</u>, the Sixth Circuit rejected the plaintiffs' argument that the defendant used the services of a real estate agency by utilizing closing documents that bore the company logo.  <u>Babin</u>, 799 F.Supp. at 705.  The court held that there was no evidence that the defendant operated in conjunction with the real estate agency in the sale of the home—the closing documents were marked N/A in the section reserved for the terms of the broker's commission and were otherwise devoid of any mention of a real estate broker.  <u>Id.</u>  Therefore, rather than holding that use of documents bearing a corporate logo is irrelevant, the <u>Babin</u> court found that other evidence suggested that the real estate agency had no involvement in the sale of the home despite use of the corporate logo on the closing documents.

Unlike the facts in <u>Babin</u>, here, Mr. Hylton performed all of the tasks of a property manager in the rental of 5 Townline Road, <u>see</u> <u>HUD ex rel. Garrett et al. v. Maze et al.</u>, No. 10-M-015-FH4, 2011 WL 2201105, at *2 (HUD ALJ May 25, 2011) (finding that respondent was in the business of renting housing because he actively managed rental properties and engaged in rental services including "entering into rental agreements, collecting rent and security deposits from tenants, providing and paying for water service for the trailers, maintaining the trailers, and completing repairs on the properties"), he shielded Mrs. Hylton from performing these tasks[7], he repeatedly used HREM documents to rent his property, and he personally signed each of the leases even though he was not the owner, suggesting he was acting through HREM as Mrs. Hylton's agent.  Therefore, the court concludes that the exemption in section 3603(b)

---

[7] Mrs. Hylton testified that only her husband met with prospective tenants, collected rent, and served as the contact for the rental.  In addition, a number of ads were posted regarding rental of 5 Townline Road.  Mrs. Hylton testified that, after the Bilbos moved out of 5 Townline Road, one of those advertisements was placed by her niece, at her request.

does not apply and Mrs. Hylton remains liable under sections 3604(a) and (b) in addition to section 3604(c).

    E.  <u>Damages</u>

    The intervenors are seeking injunctive relief—in the form of three hours of training annually and three years of monitoring—as well as compensatory and punitive damages.  <u>See</u> Compl. at 6.

    1.  Injunctive Relief

    Section 3613(c)(1) authorizes the court to award a plaintiff relief in the form of "any permanent or temporary injunction . . . or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."  42 U.S.C. § 3613(c)(1).  Numerous courts have granted injunctive relief in the form of training and monitoring.  <u>See</u> <u>e.g.</u>, <u>Southern California Housing Rights Ctr. v. Krug</u>, 564 F.Supp.2d 1138, 1153 (C.D. Cal. 2007); <u>Ueno v. Napolitano</u>, 2007 WL 1395517, at *6 (E.D.N.Y. May 11, 2007).  The court should craft such injunctive relief "with a view toward the statute's goals of preventing future violations and removing lingering effects of past discrimination."  <u>United States v. Space Hunters</u>, 2004 WL 2674608, at *8 (S.D.N.Y. Nov. 23, 2004).

    The government and intervenors have not indicated how the Hyltons would be monitored or what type of training they would receive and by whom.  Without such guidance, the court does not see how it can abide by Rule 65 of the Federal Rules of Civil Procedure, requiring it to state the terms of every injunction specifically.  Therefore, the court directs the government and intervenors to file a Motion for Injunctive Relief with the court within 14 days (the defendants may respond 14 days later) so it can

consider whether the proposed training and monitoring is reasonable in light of the court's findings and so it can craft an order that meets the requirements of Rule 65.

2.  Compensatory Damages

Mr. and Mrs. Bilbo request damages totaling $76,750.  That number reflects the $1,750 security deposit that the Hyltons never returned, $50,000 in damages for Mr. Bilbo's emotional distress, and $25,000 in damages for Mrs. Bilbo's emotional distress. Ms. Wilson requests damages totaling $28,440.  That number reflects $3,440 in economic damages totaling the amount of money she spent on gas driving the farther distance to and from her children's schools for 80 weeks.  In addition, it includes $25,000 for emotional distress and loss of housing opportunity.

First, as the court found that the Hyltons failed to return the Bilbo's security deposit, and there is no evidence that there was a basis for such withholding—given that the Bilbos found a satisfactory subtenant willing to pay rent at the same rate—the court awards $1,750 to the Bilbos in money damages for loss of their security deposit. Second, the court also awards Ms. Wilson money damages to compensate her for the cost of gas used to drive the further distance from Hartford to her job in Windsor Locks and to the children's schools in Bolton.  Had Ms. Wilson been allowed to sublet the house at 5 Townline Road, she could have sent her children to school in Windsor Locks, which would have shortened her commute both to her children's schools and to her office.

Ms. Wilson testified that she drives to and from her children's schools approximately two times per week.  During football season, which lasts from the beginning of the school year in September to right before Thanksgiving, she drives to

and from school four times per week.  Connecticut law requires public schools to be in session for at least 180 days, or 36 weeks, per year.  Conn. Gen. Stat. § 10-16. Therefore, for about 12 weeks out of the year, Ms. Wilson drives to school four times per week.  For the other 24 weeks, she drives two times per week.

Ms. Wilson testified that she would either leave from work or her house to pick up her children.  Therefore, the court will determine damages based on half of her round trips each week beginning from her office to school to her home and the other half from her home to school and back.  Based on the mileage from her office and home in Hartford to the children's schools in Bolton, the court determines that she drove 3,552 miles per year.  Based on the mileage from her office and 5 Townline Road to the Windsor Locks schools, the court determines that she would have driven 633.6 miles per year. The difference in mileage per year is 2,918.4 miles.  She suffered damages from the start of the school year in September 2010 to the present, which equals 2 years and approximately 7 months.  The total difference in mileage is, therefore, 8,025.6 miles.

The federal mileage reimbursement scale set the standard mileage rate at 50 cents per miles in 2010; 51 cents per miles from January 1 to June 30, 2011; 55.5 cents per mile from July 1, 2011 to December 30, 2012; and 56.5 cents per miles starting January 1, 2013.  See Internal Revenue Service website, available at http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates; see also http://www.irs.gov/uac/2013-Standard-Mileage-Rates-Up-1-Cent-per-Mile-for-Business,-Medical-and-Moving.  The average rate over 2 years and 7 months is 54.09 cents.

Therefore, the court awards Ms. Wilson $4,341.05 in economic damages.[8]

Third, as to the request for damages for emotional distress, "[i]t is axiomatic that civil rights plaintiffs may recover compensatory damages for emotional distress." Ragin, 6 F.3d at 907.  It is not necessary for a plaintiff to provide evidence of treatment by a healthcare professional or use of medication to be entitled to damages for emotional distress.  See Parris v. Pappas, 844 F.Supp.2d 271, 278 (D. Conn. 2012) (distinguishing "significant" and "egregious" claims for emotional distress from "garden variety" claims for emotional distress).  In the context of Fair Housing Act violations, courts have "recognized the severe mental trauma associated with unlawful discrimination and have upheld large compensatory awards for the victims in such cases." Broome v. Biondi, 17 F. Supp. 2d 211, 224 (S.D.N.Y. 1997).  "The key factors in determining emotional distress damages are the complainant's reaction to the discriminatory conduct and the egregiousness of the respondent's behavior." HUD v. Walker, 2012 WL 2951587, at *2 (HUD ALJ 2012).

When claims have been categorized as "garden variety"—meaning the claim for distress is devoid of evidence of medical treatment or physical manifestation—the amount of damages authorized ranges from $5,000 to $125,000.  Parris, 844 F.Supp.2d at 278, n.9.  Here, Mr. Bilbo described the shock and pain Mr. Hylton's comments caused him.  He discussed how the comments were particularly alarming to him because he expected someone like Mr. Hylton to be an ally, not an antagonist.  The Facebook posts from his Facebook page—made soon after his conversation with Mr.

---

[8] Ms. Wilson also requested damages reflecting the additional time she spent driving to and from her children's school multiplied by her hourly wage.  There is no evidence that Ms. Wilson had to miss work to drive her children the extra distance to and from school.  Therefore, the court does not award such damages.

Hylton—reflect his anger and distress and corroborate his testimony.  However, Mr.

Bilbo did not testify to long-term distress or any interference with work or daily activities.

In fact, when asked how long his feelings of anger and hurt lasted, he testified that they

lasted for the entire day in which he had the conversation with Mr. Hylton.  Although he

testified that speaking about the incident brought back his feelings of anger and pain,

the court cannot conclude that Mr. Bilbo suffered distress for a prolonged period of time.

Therefore, the court awards Mr. Bilbo $10,000 in damages to reflect his emotional

distress.

Mrs. Bilbo spoke of the pain she felt upon hearing of Mr. Hylton's comments,

particularly as the wife and mother of an African-American husband and children.  She

also testified that she was afraid of Mr. Hylton after he threatened to sue her and her

husband for breaking the lease.  She testified that she was afraid of running into Mr.

Hylton at the grocery store.  However, these fears were as much because she and her

husband broke their lease, which angered Mr. Hylton, as it was about his discriminatory

comments.  The court cannot determine that all of Mrs. Bilbo's emotional distress was a

result of the Hylton's discriminatory conduct.  Therefore, the court awards $5,000 in

damages reflecting Mrs. Bilbo's emotional distress.

Ms. Wilson testified that she was confused by Mr. Hylton's comments and

disappointed that she would have to keep looking for a place to live.  But, she did not

testify to feeling hurt or pained by his conduct.  She merely said that she was glad she

was rejected because she did not want to rent from someone like Mr. Hylton.  It is hard

to see how Ms. Wilson suffered emotional distress based on this testimony.

However, the court finds that Ms. Wilson suffered damages in the form of lost housing opportunities.  See Short v. Manhattan Apartments, Inc., 2012 WL 6827386, at *23 (S.D.N.Y. Dec. 3, 2012) (awarding $20,000 in total damages for lost housing opportunities and emotional distress where the "[d]efendant's refusal to show Mr. Short available apartments reduced his opportunity to find suitable housing and resulted in Mr. Short's prolonged stay at an unsanitary SRO); HUD v. Jorgenson, 1995 WL 225277, at *15 (HUD ALJ 1995) (awarding $25,000 in damages for emotional distress, lost housing opportunities, and physical harm).  Based on the extensive testimony of Professor Lance Freeman, an expert in the field of "neighborhood effects," the court concludes that there are vast differences between the neighborhoods of Windsor Locks and the North End of Hartford such that a resident of the North End of Hartford has fewer "life chances" than a resident of Windsor Locks.

In the North End of Hartford, there are a lower proportion of white residents, a substantially higher rate of unemployment, a greater percentage of residents on food stamps, a higher percentage of female-headed households, and a significantly higher crime rate, particularly as to violent crime.  All of these factors are considered to be indicators of disadvantage.  Meanwhile, in Windsor Locks, the home ownership rate is a little over two times greater than the rate in the North End of Hartford whereas the median income is twice as high in Windsor Locks as compared to the North End of Hartford.  Both of these factors are indicators of advantage.  Based on these statistics, Professor Freeman concluded that there is more opportunity and greater upward mobility and achievement in Windsor Locks as compared to the North End of Hartford.  According to Professor Freeman, the North End of Hartford is a particularly

30

disadvantaged area relative to Windsor Locks.  He testified that the difference in the

rate of violent crime is so dramatic and that such violence, regardless of whether

someone is personally a victim of crime, indisputably impacts the quality of life in the

neighborhood.  Further, Professor Freeman testified that even though Ms. Wilson sends

her children to school in Bolton, CT, they are still affected by their peers in the North

End of Hartford who are not getting the same high quality education.  Based on

Professor Freeman's testimony—which the court found credible and compelling—the

court awards $20,000 in damages for lost housing opportunities.

    3.  Punitive Damages

    The intervenors also seek punitive damages.  "The FHA expressly provides for

the recovery of punitive damages by plaintiffs who have suffered discriminatory housing

practices."  United States v. Space Hunters, Inc., 429 F.3d 416, 427 (2d Cir. 2005).

"Punitive damages are limited 'to cases in which the [defendant] has engaged in

intentional discrimination and has done so with malice or with reckless indifference to

the federally protected rights of an aggrieved individual.'"  Id. (citing Kolstad v. Am.

Dental Ass'n, 527 U.S. 526, 529-30 (1999).  "An award of punitive damages is not a

matter of right but is within the discretion of the trier of the facts and will depend upon

the degree of wanton and willful conduct of the defendant."  Paris v. Pappas, 844

F.Supp.2d 271, 281 (D. Conn. 2012) (citing Flaks v. Koegel, 504 F.2d 702, 707 (2d

Cir.1974)).  "A plaintiff may establish the requisite state of mind for an award of punitive

damages with evidence (1) that the defendant discriminate[d] in the face of a perceived

risk that its actions ... violate[d] federal law, or (2) of egregious or outrageous acts that

may serve as evidence supporting an inference of the requisite evil motive." <u>Space Hunters</u>, 429 F.3d at 427 (internal citations omitted);

Mr. Hylton's conduct was, by its very nature, indicative of evil motive. <u>See Gonzalez v. Rakkas</u>, 1995 WL 451034, at *7 (E.D.N.Y. July 25, 1995) (concluding that a statement by the defendant that she did not want to rent to a Hispanic person and a corresponding refusal to rent were by their very nature willful and motivated by ill will). He showed no remorse for his conduct when he continued to make discriminatory comments to the HUD investigator pursuing Ms. Wilson and the Bilbo's claims. Therefore, the court concludes that the evidence supports an award of punitive damages against Mr. Hylton.

Furthermore, a principal may be liable for punitive damages for the act of her agent if the principal knew or ratified the acts of the agent. <u>Gonzalez</u>, 1995 WL 451034, at *7.  There is no evidence before the court that Mrs. Hylton was aware of what Mr. Hylton said during his phone conversation with Mr. Bilbo.  Although the court is troubled that the letter Mrs. Hylton sent to HUD—stating that she and Mr. Hylton "advertised the property ourselves and had received a number of offers.  We interviewed a number of people including the Wilsons and made our choice"—could suggest she was covering up the real reason Mr. Hylton rejected Ms. Wilson, the court concludes that Mrs. Hylton did not intentionally lie to HUD.  Mrs. Hylton testified that she wrote the letter based on information provided to her by Mr. Hylton.  There is no reason to believe that Mrs. Hylton  knew that Mr. Hylton did not meet Ms. Wilson.  Because there is no evidence that Mrs. Hylton was aware of Mr. Hylton's comments or the reason why he rejected Ms. Wilson, the court does not hold Mrs. Hylton liable for punitive damages.

"Although the Supreme Court has 'decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed, it has 'referenced a long legislative history . . . providing for sanctions of double, treble, or quadruple damages to deter and punish." <u>Parris</u>, 844 F.Supp.2d at 283 (internal citations omitted) (awarding punitive damages that were one and one half times greater than compensatory damages in a case in which it found the defendants' conduct "highly reprehensible").  "In determining the amount of punitive damages which will both punish and deter, a court should consider both the nature of the defendants' conduct and the defendants' financial status." <u>Gonzalez v. Rakkas</u>, at *8 (awarding $6,600 in punitive damages based on "the limited evidence submitting indicating the Rakkas' net worth, the nature of the defendants' conduct [as a single incident rather than a pattern or practice], and the recommended compensatory damages award [of $7,000]").  The court does not have any evidence regarding the Hylton's net worth nor is there evidence of a pattern or practice of discrimination.  The court, therefore, awards $15,000 in punitive damages to the Bilbos, and $20,000 to Ms. Wilson.

4.  Attorney's Fees

Lastly, the intervenors noticed their intention to seek attorney's fees for the Connecticut Fair Housing Center if they are the prevailing party.  42 U.S.C. § 3613(c)(2).  The court directs the intervenors to file a Motion for Attorneys' Fees within 14 days of the filing of this Ruling.

## III.   CONCLUSION

Based on the preceding findings of fact and conclusions of law, this court orders that judgment in the amount of $31,750 be entered in favor of Mr. and Mrs. Bilbo, and

33

$44,341.05 in favor of Ms. Wilson.  The government and intervenors are directed to file their Motions for Injunctive Relief and Attorneys' Fees by **May 15, 2013.**

**SO ORDERED.**

Dated at New Haven, Connecticut this 8th day of May, 2013.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge